(77 South. 774)

No. 22399.

ANSLEY v. CONCRETE CONSTRUCTION & CONTRACTING CO. et al.

(June 11, 1917. Rehearing Denied Feb. 7, 1918.)

*(Syllabus by the Court.)*

ATTORNEY AND CLIENT ☞135 — COMPENSATION—RECOVERY.

Where, after a protracted litigation, in which money and securities to a large amount are tied up, the litigants desire to effect a compromise and the attorney of the one stands in the way and another attorney is employed, through whom negotiations are concluded, to the knowledge of the first attorney, which lead to the compromise, and where, in such case, the one litigant makes a claim against the other to be indemnified for the indebtedness incurred by him for his attorney's fees, and an amount is paid in compromise of such claim, the attorney in question, who has in the meanwhile taken no steps for his own protection, has no standing to recover his fees from the litigant making such payment.

Appeal from Civil District Court, Parish of Orleans; T. C. W. Ellis, Judge.

Suit by Hubert M. Ansley against the Concrete Construction & Contracting Company and others. Mrs. Eugene L. Ansley was sub-stituted as plaintiff. Judgment for plaintiff against the Concrete Construction & Contracting Company, and she appeals for insufficiency of the judgment. Affirmed.

See, also, 125 La. 1052, 52 South. 153.

Lazarus, Michel & Lazarus and David Sessler, all of New Orleans, for appellant Mrs. Eugene L. Ansley. James B. Rosser, Jr., of New Orleans, for appellant Hubert M. Ansley. Howe, Fenner, Spencer & Cocke, of New Orleans, for appellee Pratt.

Statement of the Case.

MONROE, C. J. Plaintiff claimed $20,000 from the three above-named defendants, in solido, and obtained a judgment against the Concrete Construction & Contracting Company (hereafter called the Company) for $5,000, and otherwise rejecting his demand, from which judgment he prosecutes this appeal.

It appears that the Company obtained, or was in the way of obtaining, from the city of New Orleans, certain repaving and subsurface drainage contracts, which, on execution, would entitle him to about $124,000, payable in certificates that were not altogether equivalent to cash, and that, in order to obtain the cash required for the work, it entered into a contract with the defendant Pratt whereby Pratt agreed to advance the same in consideration of his receiving one-half of the profits that might be earned. It further appears that a difference arose between the parties as to the custody and use of the certificates, which resulted in a suit by Pratt for specific performance by the Company of its alleged obligations in that respect, the sequestration of the certificates which had been issued and of certain cash which had been realized therefrom, and the issuance of a writ of injunction.

Plaintiff herein had been consulted by the Company with reference to its contract with Pratt, and was employed to defend the suit

thus brought. He also, about that time, brought a suit on behalf of the Company and against Pratt for damages for alleged breaches of the contract. The suit brought by Pratt was terminated by a judgment of this court, handed down in March, 1911, whereby plaintiff's demands were denied, the sequestration and injunction dissolved, the certificates ordered to be deposited in bank and an auditing of the account between the parties directed. The matter was thereupon returned to the district court, where the auditing was done and a report thereof made in October, 1911, but, as it was not satisfactory to either party, negotiations were begun with a view to a compromise. The counsel who now represents Dr. Pratt, and who represented him in those negotiations, gives the following uncontradicted testimony concerning them and concerning the events which followed (quoting in part), to wit:

"I may state that, very shortly after the auditor's report was filed, and when those negotiations for a settlement had begun, for some reasons which I am not concerned with, the relations between Mr. Ansley and the Concrete Construction & Contracting Company became such that it was impossible for me to conduct the negotiations, or accomplish anything through negotiations, with him. The result was that the * * * Company employed other counsel, and he was the counsel with whom I finally accomplished the settlement. * * * One of the questions which were at issue * * * was in relation to the matter of counsel fees which had been incurred by the * * * Company in the course of these sequestration suits. The * * * Company claimed that, inasmuch as the sequestration had been finally dissolved, * * * Dr. Pratt was liable to them for such counsel fees as they might be liable to their counsel for. * * *. I claimed, on the other hand, that Dr. Pratt was not liable to the * * * Company for that item of counsel fees, for the reason that there had been no motion at all to dissolve the sequestration in the lower court—there was simply an answer filed on the merits, and the sequestration was dissolved as the result of a judgment on the merits of the case."

He further testifies that another member of the bar who had been associated with plaintiff was demanding his fee, and had applied for the appointment of a receiver for the Company, and that, in order to avoid that result, a settlement was made with him whereby he was paid by the joint check of the Company and Pratt, drawn on the proceeds of certificates collected by the bank in which they were deposited, such payment having been made without prejudice to the rights of either party as to liability for the fee. And the testimony proceeds:

"As far as Mr. Ansley was concerned, an earnest effort was made to effect some sort of a similar settlement with him. I, personally, saw Mr. Ansley a number of times in relation to the matter and tried to get him to agree to accept $5,000 in settlement of his fee. * * * Mr. Ansley refused positively to accept any such fee, and claimed something between $16,000 and $20,000 as his fee for services."

While the negotiations were thus pending, plaintiff visited the McCoys (who constituted the "Company") upon their invitation, and appears to have discussed the situation with them, following which, on June 14, 1912, he wrote the Company a letter reading in part:

"I have, seriously and conscientiously, gone over the entire matter subsisting between me and yourselves, and find: [Then follows a recital of services rendered by the writer, beginning with a conference in December, 1907, upon the subject of the Pratt contract, and coming down to the period following the decision of this court in the Pratt suit, after which the letter proceeds:] For some reason, which I attribute to talebearing by third persons, you became lukewarm towards me and certain correspondence passed between us by which you decided that you owed me nothing, and, finally, when Mr. Flynn [the counsel who had been associated with him] filed his suit and I told you that I would not fight him, you employed Mr. Gleason to defend that suit and, without my knowledge, permitted Mr. Gleason to accompany you to Mr. Fenner's office for the purpose of compromising all matters between yourselves and Dr. Pratt. The only action which I took was to advise you that I did not consider myself discharged and was ready and willing to carry out my employment to you to a final determination. * * *

"As I have continually advised you, since May, 1908, Dr. Pratt has forfeited his profits and owes you damages. If, by any act of yours, you have forfeited this, I am not to blame, and I am perfectly willing to carry out my retainer and push the Pratt case to a finality on the following conditions;

"First. That you have committed no act which, in good faith, would estop you from further proceedings.

"Second. That you pay me $7,500 in full set-

tlement of all services to date, plus the personal notes that I hold against you amounting to about $231.

"Third. That, if your disposition is to contest Mr. Sutton's suit against you, I am willing to undertake it, provided there is an agreement between us that cannot be disputed on either side.

"Fourth. I am willing to undertake the further prosecution of your suit against Pratt, from this date, on a contingent fee, based upon whatever I may recover. This percentage to be 20 per cent., and all costs to be furnished by you. I believe that you now realize that $7,-500 for what I have already done is sacrificing four years of health and labor and you know that I have not yet received any compensation.

"This letter is written in a friendly spirit and is purely and simply a business proposition, and is written as a compromise, without, in any way, affecting any of your rights or mine, should you decline to act."

The Company appears to have made no answer to the letter thus quoted, and, on June 15, 1912 (the day after the date of the letter) its negotiations with Pratt culminated in an agreement of compromise and settlement, by reason whereof he took over the certificates which were in controversy and tools to the value of about $30, paid various outstanding debts due by the Company, and assumed certain other debts, paid to the Company itself $18,912.50 in cash, and further agreed as follows:

"Fourth. Contemporaneously with the signing hereof, there has been deposited, subject to the joint check of the parties hereto, in the New Orleans National Bank, * * * the sum of $5,000, of which said sum $4,250 has been contributed by the said Dr. George K. Pratt, and $750 by the said * * * Company; the said sum to be employed to satisfy the claim of H. M. Ansley, Esquire, against the * * * Company, for services rendered as attorney for the said * * * Company in the suit of Dr. George K. Pratt versus John F. McCoy and the * * * Company, * * * and the other suits set forth in Exhibit A hereof, or to satisfy such judgment as may be obtained by the said H. M. Ansley against the * * * Company, on his claims for services rendered in said suits, as follows, to wit."

Then follow provisions for the various contingencies—of Ansley's accepting the $5,000, of his refusing to accept it and obtaining judgment for a smaller amount, and of his refusing to accept it and obtaining judgment for a larger amount—the provision for the contingency last mentioned being that, upon the actual contribution by the Company of one-half of the excess over the $5,000 for which such judgment should be obtained, Pratt would contribute the other half, provided that the officers of the Company should render such assistance in the defense of the suit as might be required and that Dr. Pratt should bear the expense of defending the suit. It was admitted that, if Mr. McCoy were present at the trial, he would have testified that, after the agreement of June 15, 1912, had been entered into, he repeatedly requested Mr. Ansley to accept the $5,000, which he told him he could get under the terms of the settlement, which he (McCoy) had made with Pratt, though he did not tell Ansley what these terms were, nor that the money had been deposited in bank. The money was allowed to remain as so deposited until January 13, 1913, when it was further agreed between Pratt and the Company "in full compromise, settlement, and discharge of all of its [the Company's] claims of every sort and kind against the said Dr. George K. Pratt for indemnity in the matter of the liability for attorney's fees to the said H. M. Ansley, Esquire, for professional services rendered by the said H. M. Ansley, Esquire, to it in the said suits, that the said sum so remaining on deposit * * * should be distributed as follows, to wit, $4,194.48 to the said * * * Company, and $757.50 to the said George K. Pratt." And it was so distributed. This suit was instituted about two months later, and, shortly thereafter plaintiff's wife, as the beneficiary of a dation en paiement, was substituted in his place as plaintiff.

### Opinion.

Counsel for plaintiff disclaim reliance upon any theory of a stipulation pour autrui, or that the original plaintiff was employed by Dr. Pratt, or in his interest, or rendered him

any service for which he can be held liable in this suit. There are some allegations in the petition as to a conspiracy between Pratt and the Company to prevent plaintiff from collecting his fee, and some suggestions, in the petition or elsewhere, of liability on the part of Pratt, by reason of the taking over by him of the certificates received under the city contracts, its interest in which constituted about the only asset of the Company, but those theories find no support in either the facts or the law of the case. The purpose and meaning of the judgment of this court (which the plaintiff, himself, obtained), in directing an audit of the account between Dr. Pratt and the Company, was that a basis for a settlement should thereby be established, and plaintiff knew that the settlement was to follow as the contemplated result of the report of the auditor, and that, when the parties refused to accept that report as such basis, they must either plunge into further litigation or else effect a compromise. The situation was one in which the interest of the litigants seem to demand a compromise. Dr. Pratt had advanced between $70,000 and $80,000 (Concrete & Co. v. Pratt, 125 La. 1052, 52 South. 153), which had been tied up for three years, or more, and the Company, by reason of the urgency of its creditors, had reached an impassé from which it perhaps saw no other avenue of escape. But plaintiff, as may be inferred from the course that was pursued and from his letter of June 14, 1912, being convinced that his client had a good claim against Pratt for damages, stood in the way, and his client, who apparently felt the compromise to be a necessity, dispensed with his services. From the testimony of defendants' counsel, to the effect that he found it impossible to negotiate with plaintiff, it would appear that plaintiff was afforded the opportunity to effect the compromise, and that it was only after it had been found that he could not, or would not, do so, that the Company employed another attorney. Certain it is that he was informed, whether by his client or not, that another attorney had been employed to effect a compromise, and certain it is that, though upon being so informed he wrote to his client that he did not consider himself discharged, he knew that the negotiations for the compromise were thereafter pending for months, and that he was not called on to take part, and took no part, in them, and that, beyond informing Dr. Pratt's counsel that he would not take less than $10,000 as his fee in the matter under consideration, he took no step for the collection of his fee or for the protection of his claim thereto. The question whether, in effecting the compromise, Dr. Pratt should have made any concession on account of the obligation which the Company had incurred with respect to the fee, was between him and the Company, since he was under no obligation to plaintiff in the matter, and could not well have had any relations with him from which such an obligation could have arisen. He was within his rights in settling his business difficulties with the Company as best he could, and, as one of the claims asserted against him was that he should indemnify the Company with respect to the debt which it had incurred to plaintiff, he was within his rights in settling that claim as he settled the others, and with the party by whom it was asserted. He had, however, no capacity to determine, as between the Company and its attorney, whether there was any fee due, or, if due, when or how it should be paid, and it was for the reason that neither he nor the Company were willing that the fee should figure in the compromise as a debt due by the Company, for which it might claim to be indemnified in a sum exceeding $5,000, that so much of the contract was devoted to that subject. In the contract of January 13, 1913, they did what they might have done at first, to wit, Dr. Pratt paid the Company a specific sum in settlement of its claim for indemnity in the

matter of the fee, and in full and final settlement of the whole matter, and his relation to that claim and to all others involved in the compromise was thereby terminated.

As to the taking over of the certificates, they belonged, in indivision, to Dr. Pratt and the Company; were to be disposed of in accordance with the terms of the contract between them; and it was absolutely necessary that they should have been disposed of, in some way, in order to furnish the Company with the funds wherewith to pay its debts, including that due to the plaintiff. It was agreed that Pratt should take the certificates and await the collection of the money represented by them, and that he should pay in cash to the Company and to certain of its creditors an amount which was to be, and was accepted as, the value of the Company's interest in those assets, held in common. Included in the amount so eventually paid was that agreed on in the compromise of the Company's claim for indemnity as against plaintiff's claim against it. The judgment appealed from condemns the Company to pay plaintiff Mrs. Eugene Livingston Ansley, wife, etc., substituted, $5,000, and her contention is that the amount thus allowed should be increased and that Dr. Pratt should also be condemned. For the reasons assigned, we are of opinion that those contentions are not well founded.

The judgment appealed from is therefore affirmed.